Andrew BRIDGMAN, a minor, by and through Lynne C. BRIDGMAN, his mother and guardian, Plaintiff–Appellant,

v.

NEW TRIER HIGH SCHOOL DISTRICT NO. 203 and Mary Dailey, Defendants–Appellees.

No. 97–1412.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1997.

Decided Nov. 4, 1997.

Michael D. Robbins, Gregory J. Schlesinger (argued), Schlesinger & Krasny, Chicago, IL, for Plaintiff–Appellant.

John M. O'Halloran, Matthew J. Devereux (argued), Coleman & O'Halloran, Andrea R. Waintroob, Franczek, Sullivan, Mann, Crement, Hein & Relias, Chicago, IL, for Defendants–Appellees.

Before CUMMINGS, COFFEY and EVANS, Circuit Judges.

CUMMINGS, Circuit Judge.

In 1995, Andrew Bridgman was a freshman student at New Trier Township High School. On February 27 of that year, he was required to attend an after-school smoking cessation program as a result of his having been caught smoking cigarettes on or around school property on at least two occasions. Mary Dailey, New Trier's Student Assistance Program Coordinator, supervised the smoking cessation program that Bridgman attended.

Upon Bridgman's arrival at the program, Dailey noticed that Bridgman and several other students were giggling and acting in an unruly fashion. Bridgman acknowledges that he was laughing with the other students, but denies being unruly. Dailey states that while the other students quickly calmed down, Bridgman remained distracted and behaved inappropriately during the program. Dailey says she noticed that Bridgman's eyes were bloodshot and his pupils dilated. She also claims that his handwriting was erratic on a worksheet that he completed as part of the program, and that some of his answers were "flippant."

As a result of her observations, Dailey became suspicious that Bridgman had been using marijuana. She took Bridgman into an adjoining room and accused him of being under the influence of drugs. Bridgman denied the charge, stating that he did not use drugs. Bridgman then asked to call his mother. Dailey allowed him to do so, although she insisted that he speak to his mother on a speaker phone so that Dailey could hear both ends of the conversation.

After Bridgman had spoken to his mother, Dailey took him into another adjoining room, where she had the school's Health Services Coordinator, Nurse Joanne Swanson, administer a "medical assessment" of Bridgman. The assessment consisted of taking Bridgman's blood pressure and pulse. Swanson noted that both of these readings were considerably higher than those listed on the record of Bridgman's freshman physical examination. Swanson was concerned about the high blood pressure and pulse measurements, but at no time reached the conclusion that Bridgman was under the influence of drugs. She also noted that Bridgman's pupils were dilated, but did not notice that his eyes were bloodshot, or that he was acting strangely in any way.

Following the physical examination, Dailey told Bridgman to remove his outer jersey and hat and empty his pockets so that she could conduct a search. Bridgman sarcastically inquired whether she wished him to remove his shoes and socks as well, to which she replied in the affirmative. He removed all of the requested garments, and Dailey searched them, along with the contents of his pockets. At all times, Bridgman continued to wear his undershirt and pants.

At this time, Bridgman's mother arrived. She took her son into another room to talk privately. When they returned to the room where Dailey and Swanson were, one of the two asked Ms. Bridgman for permission to test the reactivity of Andrew Bridgman's eyes to light. Ms. Bridgman asked if this test would definitively determine whether her son had used drugs, and either Swanson or Dailey told her that it would not. Ms. Bridgman indicated that she would take her son to a pediatrician in order to have a definitive drug test conducted on him. The following day, Andrew Bridgman underwent a drug test, admitted by the parties to be definitive, which indicated that he had not in fact been using marijuana.

Bridgman, through his mother, filed this action under 42 U.S.C. § 1983 against the school and Mary Dailey, alleging that both Dailey's actions and New Trier's de facto policy regarding medical assessments violated his Fourth Amendment right to be free of unreasonable searches and seizures. He also alleged a state law tort of false light invasion of privacy. Upon the school's motion, the district court granted summary judgment for the defendants on all claims. Bridgman appeals, and we affirm.

## I. SUMMARY JUDGMENT STANDARD

■■ This Court reviews a grant of summary judgment de novo. *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265. The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–2514, 91 L.Ed.2d 202. Once the moving party has produced evidence to show that it is entitled to summary judgment, the nonmoving party must affirmatively demonstrate that a genuine issue of material fact remains for trial. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir.1996).

■ In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings. "The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695. Moreover, a genuine issue of material fact is not shown by the mere existence of "*some* alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2510, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmov-

ing party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

## II. DAILEY'S ACTIONS IN SEARCHING BRIDGMAN

■ The Fourth Amendment protects public school students against unreasonable searches and seizures by school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 738, 83 L.Ed.2d 720. Because of the special circumstances of the school context, however, school officials need not demonstrate the existence of probable cause in order to justify a search of a student's person or property. *Id.* at 340–342, 105 S.Ct. at 742–743. Rather, such a search is permissible if it is both "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341–342, 105 S.Ct. at 742–743. This Court has held that the "justified at its inception" portion of the *T.L.O.* standard means that a "search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of the violation." *Cornfield*, 991 F.2d at 1320. The second *T.L.O.* requirement means that "the measures adopted [must be] reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 341–342, 105 S.Ct. at 742–743.

■ In arguing that summary judgment was inappropriate, Bridgman presented expert testimony designed to prove that the physical symptoms upon which Dailey relied—bloodshot eyes and dilated pupils—are not reliable indicators of marijuana use. The same expert testified that measuring blood pressure and pulse, as Dailey and Swanson did in the medical assessment, would not reliably indicate whether a student was using marijuana. Dailey and New Trier countered by presenting documents produced by such organizations as the American Medical Association listing, in various combinations, bloodshot eyes, dilated pupils, and heightened blood pressure and pulse rates as indications of marijuana use.

As the district court observed, the appropriate inquiry is not whether the medical profession uniformly agrees that the symptoms observed and tests conducted indicate marijuana use. Rather, the question is whether Dailey's actions in ordering the medical assessment and then searching Bridgman's outer clothing were reasonable. Dailey's own expertise as a certified drug addiction counselor, along with the publications she produced suggesting that a respectable segment of medical opinion supports both her interpretation of Bridgman's alleged symptoms and her use of the medical assessment as an investigative tool, indicate that her suspicions and further actions, based upon the symptoms she alleges, were not unreasonable. The symptoms were sufficient to ground Dailey's suspicion, and the medical assessment was reasonably calculated to uncover further evidence of the suspected drug use.

The foregoing conclusion assumes that Dailey did in fact base her decision to test and then search Bridgman upon the behavioral and physical symptoms she claims she observed. Bridgman points out that Dailey alone testified to several of the alleged symptoms that led her to believe that Bridgman was using drugs. Bridgman himself contested Dailey's claim that he was acting in an unruly fashion during the smoking cessation program. Nurse Swanson testified that when she saw Bridgman soon after Dailey formed her suspicions, she did not notice anything strange about Bridgman's behavior. She also did not notice that his eyes were bloodshot, even though she observed him closely enough to note that his pupils did appear to be dilated. In addition, Bridgman's mother, who arrived after the medical assessment, testified that her son's eyes were not bloodshot and his pupils were not dilated. She also noted nothing odd about his behavior. Dailey's observation that Bridgman's handwriting was erratic is unsupported by any evidence that she had ever seen his handwriting on previous occasions.

■ In reviewing this grant of summary judgment, we must determine whether Bridgman's challenges to Dailey's alleged ob-

servations create a genuine issue of material fact. First, "a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 939 (7th Cir.1997). Thus Bridgman's flat contradiction of Dailey's claim that he was behaving disruptively does not create a genuine issue as to that claim. What behavior counts as "unruly" is a matter of judgment, and as the person responsible for the smoking cessation program, Dailey was empowered to make that judgment. As for the observations made by Nurse Swanson and by Bridgman's mother, they occurred some time after Dailey formulated her suspicion that Bridgman was using marijuana. The fact that Bridgman's eyes may not have been noticeably bloodshot by the time Swanson and Ms. Bridgman saw him does not mean they were not bloodshot at the time that Dailey says they were. For these reasons, Bridgman has not demonstrated a genuine issue of material fact, and the challenged search was both justified at its inception and reasonably related to its objectives.

In addition, this Court agrees with the district court's conclusion that the search was not excessively intrusive in relation to its purpose. In *Cornfield,* this Court upheld the constitutionality of a strip search of a male student conducted by two male staff members. *Cornfield,* 991 F.2d at 1323. We noted that "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness." *Id.* at 1321. A less intrusive search, therefore, might be justified by grounds that would be insufficient to allow a strip search. See *id.*

The search in the present case was certainly less intrusive than the strip search in *Cornfield.* Although New Trier's written policies reflect the principle that, when possible, a search of a student ought to be conducted by a teacher or staff member of the same sex as the student, the search at issue here was not so invasive as to render Dailey's failure to recruit a male searcher unconstitutional. According to the record, Dailey never touched Bridgman at all. Nurse Swanson did touch him, but only to the limit-ed extent necessary to take blood pressure and pulse readings. During the search of his clothing, Bridgman continued to wear his pants and undershirt, and neither Dailey nor Swanson searched these garments. Although being searched for drugs was no doubt an uncomfortable experience for Bridgman, this search was not unconstitutionally intrusive.

For the foregoing reasons, this Court affirms the grant of summary judgment as to Bridgman's challenge to the medical assessment and search that Dailey and New Trier imposed upon him.

## III. NEW TRIER'S SEARCH POLICIES

■ Bridgman contends that New Trier's "de facto" policy concerning searches of students violates the Constitution. New Trier's written policy requires that each search of a student by a school official be reported in writing, regardless of whether any evidence of wrongdoing is uncovered during the search. In practice, Bridgman contends, New Trier requires written reports only when searches do uncover such evidence, leaving no written record of unsuccessful searches. Written reports, he further contends, would "obligate[ ] the school official to articulate and record the observations or other information that formed the reasonable suspicion for the search." Brief for Appellant at 32. Further, written records of all searches would allow "an inquiry into how frequently students are searched, why students are searched, [and] how many New Trier students are subjected to intrusive medical tests." *Id.* at 33.

■ A state or municipal actor such as New Trier may be liable under § 1983 if one of its policies was the "moving force" behind a constitutional violation. *Cornfield,* 991 F.2d at 1324 (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791). Here, however, the policy, or more precisely the apparent disparity between the written policy and the "de facto" policy, has not led to any constitutional violation. Bridgman may be correct that written records of all student searches at New Trier would serve desirable goals. He does not, however, point to any precedent

holding that such records are constitutional requirements. Nor does he cite authority to the effect that the alleged disparity between New Trier's written and actual policies offends the Constitution. For these reasons, Bridgman can show no genuine issue that remains for trial, and the district court's grant of summary judgment is affirmed.

## IV. STATE LAW CLAIM

The district court also granted the defendants summary judgment on Bridgman's state law claim for false light invasion of privacy, finding that he had not alleged facts sufficient to prove either publicity or actual malice, both essential elements of the claim. Bridgman's brief to this Court is silent concerning the district court's disposition of the state law cause of action. Issues not pressed on appeal are waived. See *Harris v. City of Marion*, 79 F.3d 56, 59 (7th Cir.1996); *Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir.1996). Even were this Court to consider the matter, we would not disturb the district court's grant of summary judgment because Bridgman has alleged no facts that would support a finding that Dailey acted with actual malice.

AFFIRMED.